**Strausser v. Strausser**

*Joel H. Merow,* for plaintiff.
*J. Peter Landis,* for defendant.
*Lisa D. Gentile,* guardian ad litem.

LASH, *J.,* July 15, 2011—The matter before this court is the petition of plaintiff, Gale Strausser (hereinafter "mother"), to modify the child custody order entered on November 27, 2006. Trial on the petition was held on May 23, 2011, June 24, 2011, and June 28, 2011. The court enters the following findings of fact:

## I. FINDINGS OF FACT

1.   Plaintiff, Gale Strausser (hereinafter "mother"), is

an adult individual who currently resides at 256 Briarwood Court, Allentown, Lehigh County, Pennsylvania.

2.   Defendant, John C. Strausser (hereinafter "father"), is an adult individual who currently resides at 2 North Main Street, Topton, Berks County, Pennsylvania 19562.

3.   The parties are the natural parents of a female minor child, HJS (hereinafter "minor child"), born February 3, 1996.

4.   The parties were formerly husband and wife, being married on July 7, 1995. The parties separated on December 25, 2003 and were divorced on November 10, 2009, by decree entered by the Berks County Court of Common Pleas.

5.   On November 8, 2006, this court conducted a custody trial. On November 27, 2006, this court entered a decision, setting forth, among other things, that father would have primary custody of the minor child, with mother to have partial custody on alternate weekends from Friday at 6:00 p.m. to Sunday at 6:00 p.m. and one (1) evening per week from 3:30 p.m. until 8:00 p.m.

6. During the course of the proceedings prior to the first custody trial, this court appointed Lisa D. Gentile, Esquire, as guardian ad litem. Attorney Gentile has continued as guardian ad litem for the current petition to modify proceedings.

7.   At the first trial, both parties had sought primary physical custody. Integral to this court's decision in awarding father primary custody were certain actions and influences performed by mother, which caused

psychological and emotional distress to the minor child and affected her relationship with father. The following is an excerpt from this court's opinion of November 27, 2006, which elaborates:

> It is quickly apparent that one issue far overshadows the other issues/factors relative to a determination of primary custody, namely, the exertion by mother of undue influence on the minor child. From time to time, this court is faced with a party's allegation that the other party is attempting to coax or influence the minor child into expressing a preference for that party, or otherwise "putting words in the child's mouth." These allegations can sometimes be established by evidence, but often times remain unsubstantiated. In this case, however, there is overwhelming evidence establishing that mother, in fact, has made concerted and repeated efforts to alter the minor child's thinking, alienate the minor child from her father, and fabricate, all to benefit mother's position. Mother has been blatant, dictating and directing the minor child within earshot of the guardian ad litem. Further, when confronted with this indisputable evidence, mother continued to deny, under oath, that she was in any way trying to influence the minor child....

> It is also clear to this court that the minor child has been substantially and negatively affected by mother's conduct. The minor child has become an advocate for her mother's position, fully acting in submission to her mother's wishes. She has yielded and perhaps even abandoned her own perspective. At her tender age, this

modification of her behavior could affect her ability to interact with others, her ability to be forthright, and her ability to be independent, for years to come. There is also the open question of how the minor child currently relates to father, and what type of bond will exist between the two from this point forward.

8. On August 12, 2009, mother filed the within petition to modify the custody order entered November 27, 2006, setting forth that a modification is warranted because the minor child's school grades have "dramatically gone down," the minor child has had great difficulty adjusting to the "extremely limited time she is able to spend with her mother," the minor child has had great difficulty adjusting to living with her father's paramour and her paramour's children, the minor child's preference is to reside with her mother, and mother's home provides a more stable environment for the minor child.

9. On February 22, 2010, by agreement, this court entered a new order, on a temporary basis, providing, for the most part, the same terms and conditions of the order of November 27, 2006, but adding provisions for the Christmas holiday, transportation, and for counseling, including family counseling and the continuation of the minor child's counseling.

10. Mother currently resides with her fiance, Robert W. Sherick, Jr., and his daughter, HS, born June 20, 1997. Mother has resided with Mr. Sherick since late 2003 or early 2004.

11. Father currently resides with his fiancee, Rebecca Ann Moyer, and her two (2) sons, NDM, born June 13,

1997, and SLM, born October 18, 1999. Father and Ms. Moyer began their relationship in 2006 and have been living together since March of 2007. They intend to be married on September 10, 2011.

12. Mother is employed by Behr Paints in Allentown, working Mondays through Fridays from 5:30 a.m. until 2:00 p.m.

13. Father is employed by East Penn Manufacturing in Lyons Station, Pennsylvania, working generally Monday through Saturday from 7:00 a.m. until 3:00 p.m. to 5:00 p.m. and Sunday from 7:00 a.m. to noon.

14. Father resides in the Brandywine Heights Area School District. The minor child is currently enrolled at Brandywine Heights High School and is going to tenth grade in the fall.

15. Mother resides in the Parkland School District.

16. By agreement of the parties, this court, on January 11, 2011, entered an order appointing Anthony M. Horney, Jr., L.C.S.W., to conduct a custody evaluation. The order required Mr. Horney to evaluate father's fiancee and the relationship between father's fiancee and the minor child. Mr. Horney interviewed father's paramour and the minor child in January of 2010.

17. During the summer months, the minor child is involved with a swim team and as a volunteer at the Topton Lutheran Home, working with elderly patients.

## II. DISCUSSION

Both parties seek primary custody. In making

disposition, this court considered the testimony of the parties, the evaluator, Anthony M. Horney, Jr., L.C.S.W., the parties' respective fiancees, Rebecca Ann Moyer and Robert W. Sherick, Jr., an in camera conference with the minor child, and the exhibits submitted by the parties.

Mother believes that the minor child's interests would be better suited if she resided primarily with her. Mother states that she has established a long term stable household with her fiance, Robert W. Sherick, Jr. The relationship is strong, without undue bickering or fighting. The couple plan to get married in the near future. The minor child gets along well with Mr. Sherick's daughter, HS.

The Parkland School District, where the couple reside, has an excellent reputation. The minor child has special needs and is enrolled in an IEP program. Mother contends that the IEP program is superior to the one at Brandywine Heights School District. The couple is familiar with Parkland's IEP, as Mr. Sherick's daughter is a participant. At Parkland, a committee of 12 to 15 people, including the parents, meet periodically and discuss the outstanding issues of the student, working toward a consensus for the child's best interest. On the other hand, at Brandywine, mother believes that the IEP is primarily through work on a computer.

Mother states that the minor child has a strong preference to reside with her. According to mother, the minor child consistently urges mother to do what she needs to do to obtain a change in primary custody. Mother states that she would not have pursued the modification were it not for the minor child's insistence.

Mother alleges that father's household is "unstable." Father and his fiancee have been unable to get along, and on at least two (2) occasions, father has separated from his fiancee, moving out from his residence for a short time. The minor child has difficulties with father's fiancee, does not like her, and does not want to be around her. The minor child also has problems with father's fiancee's two (2) children, including becoming engaged in physical altercations.

The volatility in father's household has resulted in the minor child being involved in several difficult incidents. On one occasion, during the course of an argument, father's fiancee telephoned mother and screamed to her: "Come pick up your f___ kid." During the course of one of father's separations, the minor child's personal belongings were placed in trash bags, ostensibly to assist with her moving with father to a new residence. After things cooled down and the minor child returned to father's home, she discovered her personal belongings remained in the trash bags, which, according to mother, was very stressful for the minor child.

Mother insists that father will not permit her to participate in legal custody matters. He refuses to provide her information regarding medical treatment or appointments. He does not include her in discussions involving the minor child's activities. In fact, he requires the minor child to engage in swimming and volunteer work at the Topton Lutheran Home, even though the minor child has no desire to participate in either of these activities. Father has also removed a cell phone from the minor child's possession, which mother had provided her

to enable the minor child to have frequent contact with mother during father's custodial time.

Mother believes that father does not invest his time in the minor child's educational needs. The minor child needs help with her homework. Father does not assist the minor child in any way, requiring the minor child to "figure it out for herself." As a result, the minor child procrastinates, with homework not getting done until she arrives at mother's house, requiring mother and the minor child to put in several hours of work to enable the minor child to become current.

Father works long hours. As a result, father's fiancee becomes the de facto primary custodian of the minor child.

Father seeks to maintain primary physical custody. He states that it is he, not mother, who can provide stability in the minor child's life. In addition, there is continuity, as the minor child would continue to reside in the same neighborhood where she has always resided, continue to attend the same school district, and have the same friends as before.

The minor child is doing relatively well in school. She has been able to maintain her grades. Contrary to mother's assertions, the IEP at Brandywine has worked well for the minor child. Also contrary to mother's assertions, father has maintained consistent oversight over the minor child's educational development.

Father acknowledges that there have been difficulties in his household but that these problems are caused

by actions of the minor child, actions which are tacitly approved of or even encouraged by mother. The minor child has instigated arguments with father's fiancee and with her children. The interactions with the fiancee's children have become physical. On one occasion, the minor child struck the child, MN, with a baseball bat, causing injuries. Whether this incident was accidental or purposeful has not been settled. On another occasion, the minor child pulled SLM from the top bunk of the children's bunk beds, resulting in him falling and striking an alligator toy or object with "alligator's teeth," causing an injury. The minor child has also engaged in tantrums and arguments. These problems have caused stress in the household, resulting in the two (2) separations. Since July of 2010, however, these problems have subsided. Father and his fiancee continue to maintain a very strong relationship and intend to be married shortly.

Father opines that mother continues to engage in conduct which tends to influence the minor child and alienate her from father and his household. He believes that she encourages the minor child to lie about father's behavior, that she, as stated, encourages the minor child to engage in disruptive behavior at father's house, and that she tries to convince the minor child to resign from the swim team and the Topton Lutheran Home. Father states that mother inappropriately includes the minor child in discussions regarding court proceedings and other topics. He believes that mother's coercion is so strong that the minor child feels forced to please mother to resolve the conflict, stating that she wants to reside at mother's house when, in fact, she would rather reside in father's house.

Further, father believes that the minor child was strongly opposed to testifying in court.

Father opines that mother has a separate agenda, to obtain custody to reduce her support obligations. He points out that the within petition to modify was filed almost immediately after the termination of temporary alimony payments from father.

Father admits that he does not want to involve mother with legal custody matters. He readily acknowledged that he has violated the previous court order by refusing to advise mother of any medical appointments or treatments. He states he did so because the minor child's allergist told father that she refused to have any further contact with mother due to difficulties in dealing with her.

Father believes that mother text messages the minor child excessively, even at midnight on a school day. Father alleges that there were 18,600 texts in one month alone. For this reason, and due to the minor child's own behavior, father has withheld the minor child's cell phones, one of which was purchased by father.

Father argues that due to mother's actions, the minor child cannot simply be herself. Her statements and actions mimic mother's. On occasion, she does start to act "normal" but then "catches herself" and reverts back to her trained behavior. The minor child remains under severe stress. The counseling, which has extended over a period of time, has not counteracted the problems created by mother.

Father urges that on most occasions, the minor child is

able to get along well with his fiancee and her children. The incidents that have taken place are unfortunate. However, father's fiancee remains committed to, along with father, providing a household for the minor child, working with her through these difficulties.

As stated, Anthony M. Horney, Jr., L.C.S.W., was hired by the parties, through a court order by agreement, to conduct a custody evaluation assessing the relationship between father's fiancee and the minor child. He met with them individually in January 2010, conducted clinical interviews, a mental status examination, and a three (3) wish interpretation, and filed a written report.

Mr. Horney noted the "obvious issue" between mother and father's fiancee, animosity, which has been stressful for the minor child. He urges conflict resolution. Other than this conflict with mother, Mr. Horney did not find any characteristics or behaviors that would be potentially harmful or abusive toward the minor child. In fact, he appears to accept Ms. Moyer's account that she is making every effort to be a positive influence in the minor child's life.

Mr. Horney found the minor child to be insecure and under stress. She recognizes herself as the center of controversy, acknowledging that, in some regards, she instigates the problems, where at other times, she perceives herself as being blamed for something she did not do. She reflects some "self-inflicted guilt" but is also willing to transfer accountability for the problems to others, primarily the adults. She has somewhat of a contentious relationship with Ms. Moyer's two (2) sons.

The minor child is also beset by conflicting loyalties between mother and Ms. Moyer. For example, when asked if she cared for Ms. Moyer, the minor child stated, "yes," noting "it's a tough balancing act." Mr. Horney declined to make any long term custody recommendations, noting a need for appropriate therapeutic intervention. Mr. Horney believes that the extensive counseling administered to the minor child over time has been excessive and may have been counterproductive. He advocated a change in the therapeutic care, with the minor child being referred to a therapist with an extensive background in custody cases. In the meantime, Mr. Horney believed that no changes in the child custody schedule is advisable.

The guardian ad litem, Lisa D. Gentile, Esquire, was appointed prior to the first trial and has continued to be involved as legal counsel for the minor child. She provided several reports dated May 2, 2006, October 26, 2010, and May 16, 2011.

The guardian ad litem recommends that the current custody order generally remain the same, providing a minor adjustment to allow mother to have the minor child for short periods of time when father is working overtime on weekends. The guardian believes that the minor child's true preference would be to continue to reside with father based on her statements to her. The minor child also has a strong need to have the litigation ended as soon as possible and to be excused from testifying or otherwise participating. This position is in contrast to mother's testimony that the minor child wants to reside with her, urging mother on several occasions to get back to court and "fight for her," with the minor child looking

forward to the opportunity to testify before the court and set the matter straight. The guardian ad litem opines that the minor child's conflicting positions stem from mother's continuing exertion of pressure on the minor child through discussions, manipulations, and guilt, causing the minor child to tell mother what she wants to hear. In her October 26, 2010 report, the guardian notes that the minor child appeared "prepped" by mother prior to meeting with the guardian, evidenced by being aware of topics to be discussed, which had recently occurred and which should not have been known to the minor child. The guardian ad litem felt so strongly about the minor child's reluctance to testify that the guardian was willing to recommend custody on a 50/50 basis for the summer months simply to avoid the need to go to trial. This conflict even extends to collateral matters, such as the swim team practices and the minor child's volunteer work at the Topton Lutheran Home. She portrays very different levels of interest in these activities, depending upon which parent is involved in the discussion.

At issue is primary physical custody. The paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello*, 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton*, 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

Section 5328 of the newly enacted child custody

statute[1] sets forth specific factors to consider in making a determination on child custody. Some of these factors are applicable to the within proceeding.

The first applicable factor concerns the question of which party is more likely to "encourage and permit frequent and continuing contact" between the minor child and the other party. This factor is difficult to assess because both parties have exhibited conduct which has restricted access of the minor child to the other party. mother's alienating activities, crucial to her obtaining an adverse decision from this court at the first trial, continues to be exhibited. The guardian ad litem's reports, in particular, reflect mother's inability to refrain from attempting to manipulate the child custody dynamic through the minor child. How much of the minor child's errant behavior stems from mother's conduct, how much from the minor child's enjoyment in being discordant, and how much father's household contributes in response, cannot be precisely quantified. Nevertheless, mother has had a significant input into this minor child's emotional and psychological distress. As far as father goes, he has refused to deal with mother at any level, taking the position that she cannot be trusted or dealt with in a reasonable manner, even to the extent of willfully violating a court order on medical matters. Whether justified or not, father's attitude in some ways is imperious, providing little opportunity for any type of reconciliation, should mother be willing to substantially modify her behavior. At this juncture, there is little hope that these parties will ever be able to work

---

1. 23 Pa. C.S.A. § 5328.

together.

The next applicable factor concerns the parental duties performed by each party. Mother has always been ready, willing and able to provide for the daily maintenance of the minor child. She provides extensive assistance in the minor child's educational development. When mother is viewed in the context of what goes on in her own household, without consideration of the interaction between the households, this factor is positive. For father's part, he is not as available as mother due to his work schedule. However, from the testimony, it is clear that father has invested significant time in the minor child's educational development. He has knowledge and insight on the minor child's needs. He has not refused to assist the minor child as mother suggests, nor relegated these matters to his fiancee. He is also very involved with her on medical issues, having paid for her orthodontia, having attended her sessions with an allergist, and otherwise overseeing her medical needs. Once again, limiting the inquiry to the dynamics of father's household, irrespective of the conflict with the other household, the minor child is well served.

The next factor concerns the need for "stability and continuity in the child's education, family, and community life." As stated, if the minor child continues to reside with father, all the dynamics in her life would remain familiar. Her educational, medical, and maintenance needs would continue to be met in a proper manner. In essence, there would be no disruption to her lifestyle. Mother, however, argues that her household is more stable, as evidenced by the two (2) separations of father and Ms. Moyer. While a transfer in custody would mean changing school districts,

mother believes that this would not be a problem and, in fact, would benefit the minor child, we note, however, that both the social and legal experts, speaking independently, agree that a change at this time would be adverse. As noted, Mr. Horney recommends that no change in custody take place at this time. This recommendation apparently stemmed from Mr. Horney's concern about the minor child's emotional and psychological state developed from the continuing tension between households. Likewise, the guardian ad litem urged that a change in custody was not warranted. This conservative approach relates in large part to the perceived need to preserve the continuity provided in father's household.

The next factor concerns the minor child's sibling relationship. The minor child has no siblings, but does interact with Mr. Sherick's daughter in mother's household and Ms. Moyer's sons in father's household. By all accounts, her relationship with Mr. Sherick's daughter is positive. They are close in age and have similar interests. On the other hand, the minor child's relationship with Ms. Moyer's two (2) sons have been problematic, as already set forth. Many of the issues that have arisen were created by the minor child, although Ms. Moyer's two (2) sons have not been totally free of fault. In any event, the disruptions have not been positive for any of these children.

The next factor, the preference of the minor child, is essential to this case. The minor child continues to state that she wants to reside with mother. This is mother's primary reason for pursuing this petition to modify. The minor child's statements, however, appear dubious to

the guardian ad litem, who strongly urges that the minor child's statements are not how she truly feels, but reflect a need to please mother and to avoid conflict and continuing litigation. Whether the minor child's preference is in some manner "well reasoned" depends on which position carries more weight. If you accept mother's evidence, the minor child wants to reside with mother because she has a closer bond with mother, and is somewhat afraid of father and his temper, which arises when he is frustrated due to the disruptions in the household. The minor child also gets along better with Mr. Sherick's daughter than with Ms. Moyer's sons. If you accept father's evidence, then the minor child's stated preference is illusory, there is no reasoning involved, and the preference cannot be accepted as credible.

The next applicable factor, the attempts of a parent to turn the child against the other parent, has already been discussed at length. At the present time, neither parent has encouraged the relationship of the minor child with the other parent. This factor militates in father's favor due to mother's behavior, protracted over time, which has compromised the minor child's psychological well-being.

The next factor concerns which party is most likely to maintain a "loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs." Again, setting aside the inter-household dynamics and looking at each household singularly, each party has the capacity to address this concern. Mother's household appears to be a peaceful and happy environment. Both Mr. Sherick and his daughter appear to be positive influences. Mr. Sherick provides the minor

child with a positive role model, appearing to be a caring, unselfish individual, as evidenced by his willingness to donate a kidney to a third party and by his paramedic work. He also shows a genuine interest in the minor child and is willing to be involved as a full-time stepparent.

Likewise, father's household has over time established itself, for the most part, as positive for the minor child. The household is primarily maintained by Ms. Moyer, who is a positive role model for the minor child. Despite the problems with the minor child, which has resulted in Ms. Moyer being pitted against mother and which include the minor child's fights with her own children, Ms. Moyer has been willing to "hang in" and continue to make the minor child feel welcome in the household.

The incidents that took place in father's home were substantial, appearing to have occurred due to the continuing rise in the level of frustration of father and Ms. Moyer to the minor child's conduct, ultimately boiling over on a few occasions. Ms. Moyer's kneejerk reaction in telephoning mother to tell her to come get her child (Ms. Moyer states there was no expletive included in the demand) was inappropriate. This incident appears to have reflected father's passive, aggressive nature. He would become frustrated with the minor child's conduct and ultimately, over time, he would "boil over," causing arguments with Ms. Moyer and resulting in father's temporary decision to separate. Father and Ms. Moyer have learned from these incidents, and it does not appear that these types of things will reoccur.

Looking at this same factor across households,

however, it appears apparent that the minor child's emotional needs are not being addressed sufficiently. The genesis of the problems rest at mother's doorstep, as set forth in this court's original opinion. Further, father's household has been ill-equipped to alleviate the continuing tension across households.

The remaining factor concerns the level of conflict between the parties and the "willingness and ability of the parties to cooperate with one another." For reasons already set forth, this court believes that the level of conflict between the parties remains high and is unacceptable. The lack of cooperation is extensive. Neither party can claim this factor as a basis for an award in their favor.

Upon consideration of these factors, this court determines that father should retain primary custody. Father and his household, for the most part, have satisfactorily addressed the minor child's needs. The tension that had been present in the household was created and fueled by the minor child, not by the actions of father or his fiancee. While the responses of the adults were not always optimal, they appear to be a thing of the past, and not a basis for warranting a transfer in custody, particularly when balancing the other positive factors present in the household. The court is reluctant to transfer custody of a child when the primary custodian is satisfactorily serving the child's best interest. *Wiseman v. Wall*, 718 A.2d 844, 846 (Pa. Super. 1998).

Further, mother's stated motive for seeking a modification, that the minor child is steadfastly advising her that she wants to reside in mother's home, is not

supported by the weight of the evidence. The guardian ad litem flatly contradicts mother, stating that the minor child has stated to her that she wants to remain with father. The guardian ad litem is credible, being independent, with her only agenda being the best interests of the minor child. There appears to be no valid reason for the guardian to manipulate or influence the minor child, or to falsely report what the minor child says to her.

As Mr. Horney suggests, and as is readily apparent, these parents need to engage in therapy in the hope that at some future time, they can begin to work together for the minor child's benefit. The minor child's psychological state must also be addressed. Accordingly, this court will order co-parenting counseling and therapy for the minor child.

This court will make an adjustment to the schedule to address father's unavailability on Saturdays. Rather than have the minor child spend a few hours on a weeknight, which also involves roughly a one (1) hour round trip, mother shall be permitted to pick up the minor child every Friday after school, keeping the minor child until approximately 6:00 p.m. on Saturday one (1) week, then for the full weekend the next week.

Accordingly, we enter the following order:

## ORDER

And now, July 15, 2011, upon consideration of the petition of plaintiff, Gale Strausser, to modify the custody order entered by this court on November 27, 2006, and after trial held, custody of the parties' minor child, H.J.S.

(hereinafter "minor child"), born February 3, 1996, shall be as follows:

1.  The parties shall share legal custody of the minor child.

2.  Defendant, John C. Strausser (hereinafter "father"), shall have primary physical custody.

3.  Plaintiff, Gale Strausser (hereinafter "mother"), shall have partial custody on one (1) weekend from Friday at 3:30 p.m. to Sunday at 6:00 p.m., and on the other weekend from Friday at 3:30 p.m. to Saturday at 6:00 p.m., and at such other times as the parties may agree.

4.  Mother shall have custody of the minor child on mother's day and father on father's day from 9:00 a.m. to 8:00 p.m. each year.

5.  The parties shall alternate custody on the following holidays: Easter, Memorial Day, July Fourth, Labor Day, and Thanksgiving. Mother shall begin with Easter in 2011, and the parties shall alternate the holidays thereafter. Custody shall be from 9:00 a.m. until 8:00 p.m. The parties shall equally divide any spring break from school.

6.  The parties shall share custody for the Christmas holiday with one (1) parent having custody from noon on December 24th until noon on December 25th and the other parent having custody from noon on December 25th until noon on December 26th. Mother shall have custody from Christmas Eve to the Christmas morning time period in even-numbered years. Father shall have custody from Christmas Eve to the Christmas morning time period in odd-numbered years. The parties shall equally divide

any remaining school vacation days over the Christmas break.

7. Each party shall be entitled to two (2) weeks of uninterrupted time with the minor child for purposes of vacation. The vacationing party shall provide the non-vacationing party with at least sixty (60) days written notice of the dates and times for said vacation. In the event of a conflict, mother's vacation shall take precedence during odd-numbered years and father's during even-numbered years.

8. The holiday and vacation schedules shall take precedence over the regular custody/partial custody schedule.

9. Unless otherwise agreed, the party commencing their period of custody shall be responsible for picking up the minor child from the other party.

10. All parties shall ensure that the minor child's homework is completed on time. In the event that any extra-curricular activity is scheduled during mother's period of partial custody, except in cases of emergency, mother shall ensure that the minor child attends. Father shall ensure that mother is provided a schedule of extra-curricular activities at the beginning of every month and give mother as much notice as possible of any change to the schedule.

11. The custodial parent shall make reasonable efforts to maintain an open phone line in his/her residence from 7:40 p.m. until 8:00 p.m. each evening so that the minor child may place calls to or receive calls from the

non-custodial parent. In the event the minor child is unavailable during that time, the parent having custody shall use an answering machine/voicemail to receive messages from the other parent. The parent having custody shall ensure that the minor child is aware of any missed call and returns any missed call as soon as possible. Neither party shall use Caller ID, Call Block, or any other device or service which limits telephone access to the minor child. The minor child shall be permitted to speak for a minimum of ten (10) minutes with the other parent, unless the minor child chooses to conclude the call at an earlier time.

12. The parties and their respective paramours, shall participate in family therapy/co-parenting counseling pursuant to the recommendation of Anthony M. Horney, Jr., L.C.S.W. The parties' counsel shall contact Sandra Lamma and Claire Malfaro to determine which counselor can best assume the role of family therapist. Each party shall be responsible for the cost of their own therapy sessions. The cost of any joint therapy sessions or of the minor child's sessions shall be divided equally.

13. The minor child shall continue to participate in counseling with Kathleen Spees once per month. The parties shall sign any releases necessary so that Ms. Spees and the family therapist can communicate to coordinate the family's care.

14. Lisa D. Gentile, Esquire, shall continue to act as the guardian ad litem for the minor child on an as needed basis. The parties shall be equally responsible for any fees of the guardian ad litem. This appointment shall continue until

the guardian deems it no longer necessary, by agreement of the parties, or upon further order of court.

15. If either party is planning to relocate with the child and the relocation will significantly impair any other party's exercise of their custodial rights, the relocating party is obligated to provide a detailed notice and counter-affidavit by certified mail, return receipt requested, to all individuals who have custody rights to the child at least sixty (60) days in advance of the proposed relocation in compliance with 23 Pa. C.S.A. Section 5337.

16. This order shall be considered a final order finally resolving the issues raised in the petition of plaintiff to modify the child custody order.

17. The attached appendix shall be made a part of the within order.

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

1. In addition to the foregoing rights, both parties shall also have the following rights with respect to the child:

A. The right to reasonable telephone contact with the

child when he or she is in the other parent's custody.

B. The right to be fully informed concerning the progress of the child in school and the child's medical status, including the right to obtain the necessary information directly from the child's school or medical practitioner; and

C. The right to be informed in advance before any important decisions are made concerning the child and the opportunity to participate in those decisions.

2. In the event of any serious illness of the child at any time, any party then having custody of the child shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the child as he or she desires consistent with the proper medical care of the child.

3. Neither party shall alienate nor permit to attempt to alienate the child from the other party. While in the presence of the child, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the child should respect and love.

4. Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the child out of the jurisdiction of Berks County in excess of three (3) days.

5. The parties shall not conduct arguments or heated

conversation when they are together in the presence of their child.

6. The parties shall, at all times, consider the child's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

7. Neither party shall question the child as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the child. By this we mean that the child will not be used as a spy on the other party. It is harmful to a child to be put in the role of spy.

8. The parties should remember that they cannot teach their child proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

9. Weekend and evening visitation shall be subject to:

A. Arrangements will be worked out beforehand between the parties without forcing the child to make choices and run the risk of parental displeasure. However, the child shall be consulted as to his or her schedule when appropriate.

B. Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the

minor child.

C.   If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the child to unnecessary apprehension and failure of expectations.

D.   The party having custody of the child should prepare him or her both physically and mentally for the transfer of custody to the other party and have him or her available at the time and place mutually agreed upon.

E.   If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the child.

F.   If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

10. If either party feels the other party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.