Belinda M. WISEMAN, Appellant,

v.

Richard A. WALL, Appellee.

Superior Court of Pennsylvania.

Submitted June 17, 1998.
Filed Oct. 16, 1998.

John J. Mooney, III, Hanover, for appellant.

Andrew B. Brown, York, for appellee.

Before McEWEN, President Judge, and DEL SOLE and TAMILIA, JJ.

TAMILIA, Judge:

Appellant, Belinda M. Wiseman, appeals from the October 10, 1997 Order of the trial court that reaffirmed the shared custody arrangement between herself and appellee, Richard A. Wall, and thereby directed the parties to continue to abide with the trial court's previous Order of January 2, 1997.[1]

---

1. The only modification imposed by the trial court was that the parents were to exchange custody every Friday at 7:00 p.m.; the January 2,

Appellant and appellee are the natural parents of Zachary T. Wiseman, born on July 9, 1996. Appellant and appellee are not married and live apart. Following his birth, the child lived with appellant, appellant's mother and appellant's mother's boyfriend. Appellee lives with his girlfriend and her daughter. On December 12, 1996, appellant filed a custody complaint to confirm primary physical custody of the child. The parties were unable to reach an agreement after the matter was referred to a conciliator. By Order of January 2, 1997, the trial court determined that a court hearing was required to resolve the dispute and further ordered that, in the interim, the parties would share legal and physical custody of the child and provided a schedule whereby appellee's rights of custody were phased in beginning with weekends only and gradually increasing to alternating weeks.

A custody hearing was conducted on October 2, 1997, at which time appellant, appellant's mother, appellant's mother's boyfriend, appellee and appellee's girlfriend all testified. By Order of October 10, 1997, the trial court affirmed the shared custody arrangement implemented by its previous Order of January 2, 1997. The trial court noted that appellant raised seven separate issues why the current custody arrangement, i.e. alternating weeks, should be changed so appellant has primary physical custody and appellee has alternating weekends only. With regard to each allegation, the trial court found that appellant either failed to present any evidence in support thereof or that the evidence presented by appellee was simply more persuasive.

As a preliminary matter, we note that courts are reluctant to disturb existing custody arrangements which have satisfactorily served the best interests of the child. *Dolan v. Dolan*, 378 Pa.Super. 321, 548 A.2d 632 (1988); *Commonwealth ex rel. J.J.B. v. R.A.McG.*, 283 Pa.Super. 185, 423 A.2d 1050 (1980). However, prior to the existence of a custody Order, the parties stand on equal footing and the only burden carried by either of them is to establish what is in the best interest of the child. *Fisher v. Fisher*, 370 Pa.Super. 87, 90–91, 535 A.2d 1163, 1165

(1988). Proof of a change of circumstances is no longer required to change a prior custody Order, shared custody, partial custody or visitation, when it is in the best interest of the child. *McMillen v. McMillen*, 529 Pa. 198, 602 A.2d 845 (1992); *Karis v. Karis*, 518 Pa. 601, 544 A.2d 1328 (1988). Prior to the Order of January 2, 1997, there was neither an agreement nor Order regarding custody of the child, and for the purpose of this Opinion, we will not assume the present Order has served the best interests of the child.

Appellant first argues the trial court erred by failing to address the lack of contact by the appellee during the first six months of the child's life when appellant was the primary caretaker. The trial court noted that appellee initially had contested paternity. Accordingly, while the extent of appellee's contact with the child during the aforesaid period of time is not a critical factor as paternity was still at issue, appellee's attitude concerning the child and his acceptance of responsibility is a factor in determining his willingness to involve himself in the child's life in an extensive shared custody arrangement. The courts have always recognized conduct of the parties during pregnancy and following the birth of the child as relevant to the type and extent of the relationship which would be created following an adjudication.

Appellant next argues the trial court erred by failing to conclude appellee's motivation for having shared custody is inappropriate. The court summarily concluded the evidence does not show an inappropriate motivation but rather the appellee's care and love for his child. The appellant refers to hearsay statements, denied by the parties, that appellee wished to remain involved with Zachary because he was a boy, rather than a girl, and that by obtaining shared custody, he would not be required to pay support. We will not disturb the fact finding role of the court on this issue. Our scope of review in child custody cases is broad. *McMillen*, 529 Pa. at 202–04, 602 A.2d at 847. While we must accept the trial court's findings of fact which are supported by the evidence, we are not bound by the trial court's deductions and

1997 Order had specified the transfer time was to occur at 6:00 p.m. on Sundays.

inferences and therefore are capable of exercising independent judgment. *Id.*; *In re Donna W.*, 325 Pa.Super. 39, 472 A.2d 635 (1984). We may not interfere with the trial court's conclusions, however, unless they are unreasonable in light of the trial court's factual findings and, thus, represent a (gross) abuse of discretion. *Commonwealth ex rel. Robinson v. Robinson*, 505 Pa. 226, 478 A.2d 800 (1984); *Barron v. Barron*, 406 Pa.Super. 401, 594 A.2d 682 (1991).[2]

In this case, the abuse of discretion alleged by the appellant is the failure of the trial court to make a proper finding that shared custody was in the best interest and permanent welfare of the child on the basis of the facts presented. While we agree with this argument, it may be extended to include the failure of the trial court to comply with the requirements in shared custody determinations relating to the ability of the parents to work together for the best interest of the child. The trial court ignored evidence of lack of communication between the parents and the extensive effort of the mother to accommodate herself to the child's need of parenting time, with very minimal efforts on the part of the father. This is particularly important with a child of tender years who was 15 months old at the time of the custody determination.

■■■ Appellant's third argument is that the trial court failed to include in its determination an analysis of the best interest of the child. *See Fisher*, 370 Pa.Super. at 90–91, 535 A.2d at 1165. In particular, appellant argues the trial court failed to address and to recognize the desirability and importance of maintaining a continued and stable custodial relationship with the parent who had been the primary caretaker. *See E.A.L. v. L.J.W.*, 443 Pa.Super. 573, 662 A.2d 1109 (1995); *Commonwealth ex rel. Jordan v. Jordan*, 302 Pa.Super. 421, 448 A.2d 1113 (1982). Appellee concedes that during the first nine months of the child's life appellant was the primary caretaker. He argues, however, that this matter does not fall within the penumbra of cases cited by appellant because

the period of time the child spent exclusively with appellant was only nine months. As stated above, however, the primary caretaker doctrine also includes the quality and quantity of care actually given to the child by the parent as opposed to the supervisory care by others while in the parent's custody. While the trial court is required to give positive consideration to the parent who has been the primary caretaker and a child should not be lightly removed from a parent with whom that child has lived since birth, we recognize this is only one factor to be considered in determining the best interest of the child. *Brooks v. Brooks*, 319 Pa.Super. 268, 277–79, 466 A.2d 152, 157 (1983). Additionally, we acknowledge a parent's ability to care for a child must be determined as of the time of the custody hearing, not as of an earlier time. *Bresnock v. Bresnock*, 346 Pa.Super. 563, 500 A.2d 91 (1985). This, however, in light of the facts presented in this case, weighs the scales in favor of primary custody by the mother.

Appellant argues the child's best interests would be served if she were granted primary custody on the sole basis that she is better able to provide a stable environment for the child. In so arguing, appellant asserts that there is a great deal of instability and change in the child's schedule when he is in appellee's care. The fact that appellee has enrolled the child in a day care program and enlisted the aide of his girlfriend in providing physical care for the child, while not necessarily evidence of an unstable environment, creates a persuasive argument that shared custody, which does not in fact result in the full involvement of the father during the time he has custody, defeats the underlying reason for shared custody and does indeed, for a child of 15 months, create more involvement with non-parental care takers than is necessary or desirable.

■■ A determination of the "best interests" encompasses consideration of the physical, emotional, intellectual and spiritual well being of the child. *Swope v. Swope*, 455 Pa.Super. 587, 689 A.2d 264 (1997). The trial court's Opinion never mentions best in-

---

2. Use of "gross" to modify the term abuse of discretion is no longer condoned as it is mere surplus verbiage. *Commonwealth v. Brown*, 550

Pa. 580, 708 A.2d 81 (1998); *Moore v. Moore*, 535 Pa. 18 n. 4, 634 A.2d 163, 168 n. 4 (1993).

terest, gives no reasons for the court's ultimate decision of shared custody, fails to do the comprehensive evaluation necessary for a shared custody determination, does not weigh the evidence as required for a best interest determination and started out with a presumptive Order of shared custody, without a hearing on January 2, 1997, which is impermissible, followed by a confirmation of that Order, unsupported by the evidence, nine months later, on October 10, 1997, after a hearing.

As an aid to the court in further proceedings in this case, our careful review of the record, exercising the broad scope of review required impels us to set forth clearly the basis of our review and order, in the same manner as required by the trial court in the first instance.

As stated in the factual outline at the outset of this Opinion, the child was conceived as a result of a limited non-romantic sexual relationship between the parties, which required a judicial determination of paternity to establish support and custodial rights in the appellee. After failure of conciliation, the court entered a shared custody Order on January 2, 1997, which continued until hearing on October 2, 1997, followed by confirmation of the Order to continue the shared custody Order.

■ The January 2nd shared custody Order was questionable at the outset as it amounted to a presumption that shared custody was in the best interest of the child, without hearing by the court or findings based upon competent evidence that shared custody was appropriate. The court in a custody dispute should avoid mechanical determinations and focus its analysis on a close scrutiny of all particular facts relevant to determining the child's best interests. *Jordan*, 302 Pa.Super. at 428–30, 448 A.2d at 1117. Paramount concern in a child custody case is the child's best interest, based on consideration of all factors that legitimately affect the child's physical, intellectual, moral and spiritual well being. *Swope*, 455 Pa.Super. at 589–91, 689 A.2d at 265.

■ Among the factors which must be considered in awarding shared custody are the following: (1) both parents must be fit, capable of making reasonable child rearing decisions and willing and able to provide love and care for their children; (2) both parents must evidence a continuing desire for active involvement in the child's life; (3) both parents must be recognized by the child as a source of security and love; (4) a minimal degree of cooperation between the parents must be possible. *Hill v. Hill*, 422 Pa.Super. 533, 619 A.2d 1086 (1993); *Andrews v. Andrews*, 411 Pa.Super. 286, 601 A.2d 352 (1991), *affirmed*, 533 Pa. 354, 625 A.2d 613 (1993).

The facts of this case support a finding that the first three criterion have been met. There is some evidence, however, that the fourth criterion, a minimal degree of cooperation between the parents, is not occurring. Appellant testified as follows:

Q. Belinda, since Mr. Wall has been exercising custody of Zachary on an alternating week basis, have you and he been able to have conversations about Zachary's welfare? Do you talk to each other?

A. No.

Q. Have you had any problem with Mr. Wall refusing to use things as say, a car seat or anything of that nature?

A. Just doctors.

(N.T., 10/2/97, at 29.) There was also a discussion and disagreement about vitamins and the refusal to give Zachary the ones directed by his pediatrician. Rather he was given chewable vitamins taken by an older child in the home. *Id.* at 30. A second disagreement occurred when the child became ill while in the father's care, and instead of taking him to the child's pediatrician, he was taken to the father's doctor, who ordered prescription medication. The mother became aware of the illness and need for medication when she was notified of the prescription. Father had called the pediatrician to determine if he was allergic to the medication and was advised he should only be seen in the pediatrician's office. Mother informed appellee of this, indicated she would pick Zachary up and bring him back and father's response was that he didn't care, "do what you want" and hung up (*Id.* 30–31). When asked if she had ever seen the inside

of the house in which Zachary stayed, mother said no. She did not ask to see it nor was she invited (*Id.* at 31–32). After the week to week shared custody began, appellee was asked about day care arrangements for Zachary, but mother never got anything out of him and it was Stacey, appellee's girlfriend, who told her it was an excellent day care center (*Id.* at 32–33). When appellee was asked by his lawyer, "How do you and Belinda communicate?", his response was "To be honest, we don't communicate that often—by phone once in a while" (*Id.* at 108–109). At best, communication and cooperation concerning Zachary were less than minimal, and primarily through third persons. All relationships leading up to the custody Order were pursuant to legal complaints and court Order rather than amicably and, ultimately, the appellee was mandated to attend conciliation/mediation sessions and only acknowledged paternity when confronted by blood test results and the refusal to permit him to pursue custody actions until paternity was legally established.

██ The appellant testified appellee's girlfriend told her, although ignored by the trial court, that appellee would be interested in the child only if it was male. When appellant told appellee she was pregnant, he stopped coming around and the only contact she had before Zachary's birth was to inform him he was responsible for her pregnancy. She saw appellee twice thereafter when he stopped to see the child after his birth, and at appellant's request for money, gave her $20. Thereafter, contacts were pursuant to support and custody petitions. Nothing prior to the birth of Zachary, after the pregnancy and until the custody hearing in October indicates that there is a meaningful degree of cooperation between the parents as to Zachary's care. The trial court was required to make at least a minimal finding that the parties were able to cooperate before awarding shared custody in January 1997; shared custody would have been inappropriate if the parties could not cooperate. *Hill, supra.* That finding was not made and shared custody is not supported by the record.

The second major evaluation of the factual circumstances relating to best interest of the child concerns the environmental and physical stability of the child considering his tender years and possible disruptive effect of weekly changes of his home and caretaker. In this case, Zachary, who was born on July 9, 1996, was ordered into a shared custody arrangement in January 1997, just six months after his birth, requiring, after an initial adjustment routine of a month or two, that he be transferred from his mother's home to his father's home on a week to week shared basis. Initially, the question which the court should have asked and determined to her satisfaction, under the facts and circumstances of this case, was whether the arrangement was in the best interest of the child. The court made no finding and did not inquire beyond what appeared on the record as to the effect this arrangement would have on Zachary. When questioned by counsel, mother testified that based upon Zachary's behavior, it was not working. In response to her lawyer's questions, she answered:

A. Because I think week-to-week would be hard on him. I can see a change in him now.

Q. What do you mean by that?

A. First couple of nights he wakes up screaming; he don't know where he is at, and then once someone is there for him, he is fine.

Q. Do you think that (primary custody) would be a more stable arrangement?

. . .

A. Yes I do.

(N.T. at 33–34.)

It does not require an expert in child development to advise that such an arrangement under the best of circumstances would be disruptive and destabilizing for an infant. Unfortunately, the child at this age cannot speak to his discomfort or anxiety under these circumstances, and the consequences of prolonged disruption in his week to week physical and caretaker environment will not be known for years. It has been likened to taking a seedling tree from the nurturing soil every other week and replanting it, and then expecting the roots to take hold and sustain the maturing plant. The weekly transfer without more would have a detrimental effect

to the child's permanent welfare even if other factors did not add to the destabilization.

▬ Zachary has not had the benefit of being born into a loving relationship and an intact family, which in most cases is the norm which society would select for him. He is fortunate that he is surrounded by several persons, including his mother and father, who love him and wish to provide a proper and nurturing environment for his growth and development. Unfortunately, outside the intact family, these very appropriate attitudes, interests and commitment cannot be exercised in Zachary's best interest if the parents place their interests first and are unwilling to give up some of their desires for involvement with Zachary. In a custody case between fit parents, the test of best interest is initially weighed equally as to each parent and a parent will prevail when the weight of the evidence shifts even slightly in his/her favor. *Sawko v. Sawko*, 425 Pa.Super. 450, 625 A.2d 692 (1993); *In re Custody of Hernandez*, 249 Pa.Super. 274, 376 A.2d 648 (1977).

▬ Returning again to the facts as presented by the record, it is clear that appellant/mother, in this somewhat chaotic situation as it applies to Zachary, is to be favored as the primary caretaker. She assumed this role at birth, and despite the disruption of that role due to the shared custody Order, on balance she still must be considered the primary caretaker. To assure that she is with Zachary during the time he most needs the attention of a parent, her work schedule permits her to be home during the day and the major waking hours of her young child. She lives with her mother, who also shares care and supervision of Zachary during the evenings before he is put to bed. This arrangement is ideal for Zachary, with the most minimal disruption allowable by having him with a baby-sitter only between the time the appellant goes to work and the grandmother returns from work at the same factory. Zachary is thereby in his home for the most critical parts of the entire day, and with his mother, the greater period of his waking hours, and less than two hours a day with a non-family member. At his age, this is a significant and important element in his stability, in both the relationships with parental figures and in remaining for the most part in his own home. In custody decisions the court must consider the importance of continuity in the child's life and the desirability of development of a stable relationship with established parental figures and known physical environment. *Gerber v. Gerber*, 337 Pa.Super. 580, 487 A.2d 413 (1985). A third person in the home, the grandmother's boyfriend, has had a stable relationship with the family and appears to be a fit person to be involved with the family and the child. He participates as a parental figure in various ways and contributes to the stability provided by this environment.

Conversely, the father works a daylight shift and leaves for work at 5:30 a.m., and when Zachary is with him, his association with Zachary, except on weekends, is at best for a period of about two and one-half to three hours between 5:30–8:30 p.m., when the child goes to bed. Additionally, he is sometimes asked to work on Saturdays which further limits his time with his child (two Saturdays a month when father agrees). The primary responsibility for dealing with Zachary's needs during the day falls on the father's girlfriend. Those needs primarily consist of transporting Zachary to a full-time daycare center, and doing likewise for her daughter at a different center (N.T. at 93–94). The children are returned home at about 5:30 p.m.

▬ Much can be said about quality times, but it is unlikely that, assuming fitness of both parents, the time spent by the father and his girlfriend in any way is comparable with that spent by the mother, grandmother and her boyfriend. In short, the primary waking hours of Zachary while in the father's custody (7:30 a.m. to 5:30 p.m.) are spent in a daycare center, whereas most of the identical hours, when in the mother's custody, are spent with her. It is inconceivable that the marginal time spent with the father in any way equates to the destabilization of Zachary in moving weekly from one bed to another, from one home to another and from primary care by the mother to secondary care of a daycare center. As such, the mother in the first instance was the primary caretaker and

despite the shared custody arrangement, her work schedule permits her to remain the primary caretaker. Also it is unquestionable that she will always be there for Zachary as will be the supporting figure of the maternal grandmother. As to the father, his relationship with his girlfriend was on and off again before Zachary came into the picture and it is conjectural at best how long that relationship will continue. Zachary's position, vis a vis shared custody with the father, can change suddenly and disruptively with the separation by the girlfriend, whereas the arrangement and relationships in the mother's home with the grandmother are likely to continue indefinitely because of the consanguineous bind. When both parents are otherwise fit, one parent's role as the child's primary caretaker may be given weight as the determining factor in a custody determination. *Wiskoski v. Wiskoski*, 427 Pa.Super. 531, 629 A.2d 996 (1993), *appeal denied*, 536 Pa. 646, 639 A.2d 33 (1994); *also see Sawko, supra.*

 As stated above, the weight of the evidence establishes that the parents have difficulty in communicating in relation to the basic needs in Zachary's life. By far mother has assumed the primary caretaker role in Zachary's life, and an arrangement whereby Zachary spends most of his waking hours with his mother rather than most of his waking hours in a daycare center, and being able to remain in a single environment with the same parenting figures and to sleep in the same bed each night strongly weighs in his best interest and in favor of primary custody with the mother. The results desired by the father and mandated by the Custody Act, **Declaration of policy**, 23 Pa. C.S.A. § 5301, which states "it is the public policy of this Commonwealth, when in the best interest of the child, to assure a reasonable and continuing contact of the child with both parents ... and the sharing of the rights and responsibilities of child rearing by both parents ...", can best be met in this case by awarding partial custody to the father and primary custody to the mother.[3]

The shared custody Order is vacated; this case is remanded for proceedings and a custody Order in conformity with this Opinion.

Jurisdiction relinquished.

---

3. We are aware that in most cases of a finding of abuse of discretion, the case is remanded for further consideration, however, where as here, the record is sufficiently developed, we may substitute our judgment for that of the hearing judge and decide the case on the merits. *In re Michael T.L. v. Marilyn J.L.*, 363 Pa.Super. 42, 525 A.2d 414 (1987); *In re Custody of Temos*, 304 Pa.Super. 82, 450 A.2d 111 (1982); *McAnallen v. McAnallen*, 300 Pa.Super. 406, 446 A.2d 918 (1982).